## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ARCHDIOCESE OF WASHINGTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 17-2554 (ABJ) |
| ) | |
| WASHINGTON METROPOLITAN ) | |
| AREA TRANSIT AUTHORITY, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

### MEMORANDUM OPINION

This case, brought by the Archdiocese of Washington, Donald Cardinal Wuerl, Roman

Catholic Archbishop of Washington, involves the plaintiff's desire to publish an advertisement

that conveys a religious message on government property: the exterior of a public bus.



Plaintiff seeks to place the advertisement on buses operated by the Washington

Metropolitan Transit Authority ("WMATA") as part of the Archdiocese's "Find the Perfect Gift"

Christmas campaign. As the Secretary for Pastoral Ministry and Social Concerns for the

Archdiocese, Dr. Susan Timoney, explains in her declaration to the Court:

> The Find the Perfect Gift campaign is an important part of the Archdiocese's evangelization efforts. . . . The campaign seeks to invite the public to consider the spiritual meaning of Christmas, to consider celebrating Advent/Christmas by going to Mass at one of our parishes and/or joining in one of our many outreach programs that care for the most vulnerable and poor during Advent and beyond.[1]

WMATA has rejected these ads on the basis that they are inconsistent with the agency's existing advertising Guidelines, in particular, the Guideline that prohibits "[a]dvertisements that promote or oppose any religion, religious practice or belief."[2]

The Archdiocese has filed a five count complaint that asks the Court to declare the Guideline to be unconstitutional, and because the advertising campaign is specifically tied to the liturgical season of Advent, which has already begun, it has moved for a temporary restraining order and preliminary injunction that would direct WMATA to immediately accept the advertisements. Emergency injunctive relief is an extraordinary remedy that may only be awarded based on a substantial showing that the plaintiff is likely to succeed on the merits of the claims in its lawsuit, so the Court must determine at this early stage whether plaintiff is likely to be able to prove that its constitutional or statutory rights are being violated.

Plaintiff cannot carry that burden. The Court recognizes that plaintiff's pursuit of the advertising campaign is a manifestation of its faith, but the case does not turn upon whether the message has value, or whether the Court anticipates that it will be well-received or it will offend. The dispute must be decided in accordance with Supreme Court precedent and the binding decisions of the D.C. Circuit, and the applicable constitutional principles are quite clear.

---

1       Decl. of Dr. Susan Timoney, S.T.D., Ex. 2 to Compl. [Dkt. # 1-2] ¶¶ 4–6 ("Timoney Decl.").

2       WMATA, Guidelines Governing Commercial Advertising (2015), https://www.wmata. com/about/records/upload/Advertising_Guidelines.pdf. ("WMATA Guidelines")

First, it is well-established that private religious speech is as fully protected under the Free Speech Clause as secular private expression. And when government property is fully open to the public as a place to express its views, the government may not discriminate among prospective speakers based upon the subject matter they wish to address or the viewpoint they intend to convey. But, when government property has not been designated or made available for broad public use for communicative purposes, different rules apply. Control over access to a nonpublic or limited forum may be based on the subject to be discussed as long as: the lines drawn are reasonable given the purpose of the forum involved, they do not favor one viewpoint over another, and they are consistently applied.

It is also settled as a matter of law that the exterior of a bus is not a public forum open to anyone who wishes to address any topic. The Archdiocese conceded this at the hearing on the motion. WMATA determined two years ago, after polling the community, that it will not accept advertisements related to such potentially divisive topics as politics or religion. A government agency may restrict the use of its property based on the content of the message to be broadcast as long as the restriction is neutral and reasonable. This is not a high threshold to overcome. Since the restriction does not silence or restrict any particular viewpoint, and it grew out of well-founded concerns for the safety of the public and WMATA employees, as well as a desire to reduce vandalism and the administrative burdens involved with spending significant time reviewing proposed ads, the Guideline meets the test that it be neutral and reasonable.

Plaintiff suggests that its understated campaign, "a simple message of hope, welcoming all to Christmas Mass or in joining in public service,"[3] is hardly objectionable, but divisive is in the eye of the beholder, and if WMATA were to make distinctions based on its own judgment about

---

3      Pl.'s Mot. for TRO & Prelim. Inj. [Dkt. # 2] ("Pl.'s Mot.") at 10.

which religious statements were likely to offend, it would be making the very sort of determination that plaintiff insists that the Constitution forbids. Thus, WMATA's decision comports with the law that this Court is bound to follow in interpreting the Free Speech Clause of the First Amendment.

Faced with this legal landscape, plaintiff attempts to reframe the issue by arguing that WMATA is not enforcing a neutral content-based prohibition at all, but that it is denying the Archdiocese the opportunity to express its particular religious viewpoint about a general topic that others are freely permitted to discuss on bus property: Christmas. Plaintiff does not point to any specific commercial advertisements that are currently appearing, but it posits that since WMATA would accept commercial advertising during the Christmas season, the agency has welcomed the expression of the secular "viewpoint" that the holiday should be commercialized, and therefore, it cannot exclude the opposing viewpoint that members of the public should connect with the spiritual origins of Christmas instead. While it is true that a governmental organization may not open its doors to the discussion of a certain subject and then exclude the expression of the religious perspective on that subject, that is not what is happening here, and WMATA's approach is, in fact, viewpoint-neutral.

Plaintiff's description of both sides of this hypothetical conversation is not persuasive. Commercial advertisements do not by definition express a viewpoint or perspective about the true meaning of Christmas or how it should be observed; they suggest to potential shoppers – who fall at every point along the religious spectrum, and who may choose to purchase gifts in December

for a multitude of faith-based or secular reasons – where to shop or what to buy.[4]    And, the Archdiocese's proposed advertising campaign is not commentary about some other permissible topic – a topic other than religion – from a religious perspective; it is plainly a statement about *religion* from a religious perspective. Therefore, WMATA's decision did not violate the Archdiocese's First Amendment right to freedom of speech.

With respect to the Archdiocese's claim that its religious rights are being violated, it is axiomatic that the government cannot favor one religion over another without running afoul of the Establishment Clause.  The government cannot specifically target or selectively burden a practice because of its religious motivation without violating the Free Exercise Clause, and the Religious Freedom Restoration Act ensures that the federal government cannot compel religious adherents to take actions that would violate their sincerely held religious beliefs, even if the regulation being resisted is neutral in its intent and broadly applied.

WMATA's policy does none of those things.  Neither the Guideline nor its application in this case interferes with plaintiff's right to practice its religion in any way, and it does not compel the Archdiocese to take any action that burdens its sincere religious convictions.  The Guideline does not establish any preference for or against one religion over another, and it is neutral and generally applicable, and therefore, WMATA's decision in this case does not violate either the Constitution or RFRA.

---

4    Also, the record does not contain any examples of seasonal retail advertisements on Metrobuses, and it does not reveal what they might say or whether there are any that refer to Christmas.  So it is difficult to determine whether they convey a viewpoint or what it might be, or to find that the predicate for plaintiff's claimed need to present a countervailing religious viewpoint has been established.

Plaintiff acknowledges that its advertisement promotes religion and sends a religious message, and therefore, it falls squarely within the prohibition in the Guideline.[5] But plaintiff maintains that the Guideline has been discriminatorily and arbitrarily enforced, favoring other religious advertisements over those sponsored by the Catholic Archdiocese, and that therefore, it is invalid on its face and as applied. But the record does not support this contention. None of the advertisements plaintiff highlights to make that point – neither the ads heralding the opening of another CorePower Yoga fitness studio in Clarendon, Virginia ("Muscle + Mantra"), nor the ads soliciting contributions to the Salvation Army's Red Kettle effort ("Give Hope. Change Lives") "promote or oppose any religion." While the Salvation Army is a Christian organization, and its charitable efforts, like those of the Archdiocese and other religious organizations, may be motivated in some measure by religious beliefs, the ads it chose to display on the buses do not promote or advance religion. Therefore, WMATA's policy is not likely to be found to violate the First Amendment or the Equal Protection Clause on the grounds that it has been inconsistently applied. And plaintiff does not argue at this stage of the litigation that the prohibition could violate the Due Process Clause in some other way if it satisfies the First Amendment.

---

5    At one point, plaintiff took pains to emphasize the understated nature of its proposed advertisement. *See* Compl. ¶ 11 (stating that "the advertisements depict, in minimalist style, a starry night, with silhouettes of a small group of shepherds and sheep standing on a hill"); *see also* McFadden Decl. ¶ 18 (stating that the advertisements "do not convey an overt religious message on their face"); Pl.'s Mot. at 16 ("The Archdiocese has sought to convey a message of hope and charity for the Christmas season and it has done so with a simple image of shepherds in the night."). But plaintiff could not have it both ways. The religious essence of the message is fundamental to plaintiff's claims that its First Amendment rights have been violated and that it has suffered irreparable harm. *See* Compl. ¶ 35 ("arbitrary enforcement of WMATA's policy violates the Archdiocese's First Amendment right by prohibiting it from emphasizing the religious reasons for the season"); *see also* Compl. ¶ 42 ("the prohibition . . . violates the Free Exercise Clause of the First Amendment by disfavoring religious speech"); Compl. ¶ 49 ("the prohibition . . . places a substantial burden on the Archdiocese's exercise of its religion").

For all of these reasons, to be explained in more detail below, the Court finds that plaintiff is not likely to succeed on the merits of its claims, and it has not shown that it will be irreparably harmed by the violation of its rights, so the motion for injunctive relief will be denied.

## BACKGROUND

Defendant WMATA operates the Metrorail and Metrobus systems in the Washington, D.C. metropolitan area pursuant to an interstate compact between Maryland, Virginia, and the District of Columbia.  Compl. [Dkt. # 1] ¶ 7.  To fund its operations, WMATA sells advertising space on its buses and trains.  Decl. of Lynn M. Bowersox, Assistant General Manager for Customer Service, Communications, and Marketing at WMATA, in Supp. of Defs.' Opp. to Mot. for TRO & Prelim. Inj. [Dkt. # 10-1] ("Bowersox Decl.") ¶ 3.  Prior to May 2015, WMATA accepted paid advertisements that were religious and political in nature in addition to purely commercial ones. Compl. ¶ 20; Defs.' Opp. to Mot. for TRO & Prelim. Inj. [Dkt. # 10] ("Defs.' Opp.") at 5.  On May 28, 2015, WMATA's Board of Directors adopted a motion by its Chair to temporarily suspend all issue-oriented advertising, including all "political, religious and advocacy advertising" until the end of that year while it conducted further review and solicited public comment.  *See* Resolution, Ex. A to Defs.' Opp. [Dkt. # 10-3].  The complaint alleges that at the conclusion of that process, "WMATA staff recommended extending the ban because of concerns that issue-oriented advertising could provoke community discord, create concern about discriminatory statements, and generate potential threats to safety and security from those who [sought] to oppose the advertising messages."  Compl. ¶ 22; *see also* Bowersox Decl. ¶ 9 ("[WMATA's] review ultimately concluded that the economic benefits of such issue-oriented ads, including ads promoting religion, were outweighed by four considerations: community and employee opposition, security risks, vandalism, and administrative burdens.").  On November 19, 2015,

WMATA's Board of Directors voted to make its prohibition on issue-oriented advertising permanent. Ex. B to Defs.' Opp. [Dkt. # 10-3]; Compl. ¶ 22.

The Guidelines that have been in force since that time prohibit advertisements on a number of topics. Of particular relevance here, Guidelines 9 through 14 provide:

> 9. Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.
>
> 10. Advertisements of tobacco products are prohibited . . . .
>
> 11. Advertisements that support or oppose any political party or candidate are prohibited.
>
> 12. Advertisements that promote or oppose any religion, religious practice or belief are prohibited.
>
> 13. Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited.
>
> 14. Advertisements that are intended to influence public policy are prohibited.

*See* WMATA Guidelines.

On October 23, 2017, the Archdiocese contacted WMATA's third-party vendor about buying advertising space on the taillights of public buses as part of its "Find the Perfect Gift" campaign. Compl. ¶ 16. According to the Archdiocese, "[t]he Find the Perfect Gift Campaign is an important part of the Archdiocese's evangelization efforts." Timoney Decl. ¶ 4. "The advertisements . . . encourage individuals to return to church during Advent and to give charitably in their communities." Pl.'s Mot. for TRO & Prelim. Inj. [Dkt. # 2] ("Pl.'s Mot.") at 6. That message is delivered through a number of platforms, "includ[ing] advertisements and materials for distribution in parishes within the Archdiocese, advertisements for display in public places throughout the metropolitan area," including transit shelters not owned by WMATA, and an "integrated online campaign." Decl. of Edward McFadden, Ex. 1 to Compl. [Dkt. # 1-1]

("McFadden Decl.") ¶¶ 3, 6.  On October 23, 2017, plaintiff submitted the following ad to WMATA's third-party vendor, which directs the public to the Find the Perfect Gift Campaign website and hashtag:



McFadden Decl. ¶ 7; Ex. D to McFadden Decl.

When one follows the link, the landing page of the website features a banner across the top of the page:  "JESUS is the perfect gift.  Find the perfect gift of God's love this Christmas."  The homepage then offers a choice of links to "FIND" ("The Perfect Gift"); "DISCOVER" ("Advent and Christmas Traditions"), and "GIVE" ("The Perfect Gift.").  *See* Find the Perfect Gift, https://www.findtheperfectgift.org (last visited Dec. 8, 2017).  The "FIND" page states:

> God has prepared an amazing gift for you. A place of peace, joy, and community with God and others.  In the frenzy of buying gifts for others, take time to receive God's love for you at Christmas Mass.  Find Christmas Mass times throughout the Archdiocese of Washington using the map below!

*Id.*  The "DISCOVER" page describes ways to observe Christmas and Advent, and the "GIVE" page details many opportunities available through Catholic Charities in the Archdiocese of Washington to "[s]hare the joy of Christmas . . . by helping others."  *Id.*

According to the plaintiff on October 24, 2017, WMATA's third-party vendor informed plaintiff that its proposed ad would not meet WMATA's Guidelines and could not run as submitted.  McFadden Decl. ¶ 13; Ex. G to McFadden Decl.  The Archdiocese responded that it

did not "see a way to adjust the ad given its purpose and message" and asked whether there was a way to appeal the decision. Ex. G to McFadden Decl. The third-party vendor sent plaintiff's proposed ad to WMATA for further review, and upon review of the ad, WMATA concluded that the ad violated Guideline 12 and denied plaintiff's request on November 8, 2017. McFadden Decl. ¶ 15; Ex. G to McFadden Decl.[6] In response, plaintiff's counsel sent a letter to the general counsel of WMATA raising First Amendment concerns and urging the agency to reverse its decision quickly because the season of Advent was imminent. Compl. ¶ 18; Ex. H to McFadden Decl. On November 20, 2017, WMATA, through its counsel, again denied the request. Ex. I to McFadden Decl.

A week later, on November 28, 2017, plaintiff filed a complaint with this Court. The complaint raises five constitutional and statutory claims:[7] Count I alleges that Guideline 12, on its face and as applied, violates plaintiff's right to freedom of expression under the Free Speech Clause of the First Amendment. Count II alleges that Guideline 12, on its face and as applied, violates the Free Exercise Clause of the First Amendment. Count III alleges that Guideline 12 substantially burdens plaintiff's right to exercise its religion in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. Count IV alleges a violation of plaintiff's rights under the

---

6     A declaration submitted by WMATA in opposition to the motion stated that WMATA "reviewed the content of https://www.findtheperfectgift.org/ as it existed at the time" the ad was submitted and "based on the ad and the website," WMATA found that the ad violated Guideline 12 and rejected it. Bowersox Decl. ¶¶ 19–20.

7     Plaintiff's motion for a temporary restraining order and preliminary injunction also predicates its claim for relief on the Establishment Clause, but there is no Establishment Clause claim in the complaint, so the Court cannot rule on its likelihood of success. *See* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). In any event, plaintiff's Establishment Clause argument is identical to its Free Speech and Equal Protection claims based on the alleged inconsistent and/or discriminatory enforcement of the Guideline.

Equal Protection Clause of the Fifth Amendment, and Count V alleges a deprivation of life, liberty

or property without due process in violation of the Due Process Clause. *See* Compl. ¶¶ 28–64.

Based on these claims, plaintiff seeks the following relief:

1. A declaration that Guideline 12 "violates the rights of the Archdiocese under the Free Speech Clause of the First Amendment;"

2. A declaration that Guideline 12 "violates the rights of the Archdiocese under the Free Exercise Clause of the First Amendment;"

3. A declaration that Guideline 12 violates the Religious Freedom Restoration Act;

4. A declaration that Guideline 12 "violates the rights of the Archdiocese under the Equal Protection principles of the Fifth Amendment;"

5. A declaration that Guideline 12 "violates the rights of the Archdiocese under the Due Process Clause of the Fifth Amendment;"

6. An "injunction preventing Defendants from enforcing" Guideline 12 "to reject the Archdiocese's request to purchase advertising space for the 'Find the Perfect Gift' campaign;"

7. An "award of attorney's fees and costs to the Archdiocese;" and

8. "[O]ther relief as the Court may deem just and proper"

Compl. at 16–17.

At the time plaintiff filed its complaint, it also filed a motion for a temporary restraining

order and preliminary injunction asking that the Court order WMATA to run its proposed ad "as

soon as possible" since the beginning of Advent, December 3, 2017, was only a few days away.

Defendants filed their opposition to plaintiff's motion on December 4, 2017 and plaintiff replied

on December 5, 2017.  Reply to Defs.' Opp. [Dkt. # 12] ("Pl.'s Reply").  On December 5, 2017, the Court held a hearing on the motion.[8]

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations omitted).  A party seeking a preliminary injunction must establish the following: 1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in its favor; and 4) an injunction serves the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The manner in which courts should weigh the four factors "remains an open question" in this Circuit.  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014).  The Court of Appeals has long adhered to the "sliding scale" approach, where "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  But because the Supreme Court's decision in *Winter* "seemed to treat the four factors as independent requirements," the Court of Appeals has more recently "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Id.* at 392–93, quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).  Although the D.C. Circuit has not yet announced whether the "'sliding scale' approach remains valid after *Winter*," *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016), the Court of Appeals has ruled that a failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary

8       The record has been supplemented with the Declaration of Robert O. Potts, in Support of Defendant's Opposition [Dkt. # 13], the Declaration of Michael F. Williams [Dkt. # 14], and the Declaration of Rex S. Heinke [Dkt. # 15].

injunction. *See Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006). As another court in this district has observed, "'[i]t is particularly important for the movant to demonstrate a substantial likelihood of success on the merits,' because 'absent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review.'" *Navistar, Inc. v. EPA*, No. 11-cv-449, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011), quoting *Hubbard v. United States*, 496 F. Supp. 2d 194, 198 (D.D.C. 2007) (internal edits omitted).

Regardless of whether the sliding scale framework applies, it remains the law in this Circuit that a movant must demonstrate irreparable harm, which has "always" been "the basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959) (internal edits omitted). A failure to show irreparable harm is grounds for the Court to refuse to issue a preliminary injunction, "even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## ANALYSIS

### I.     Count One:  The Freedom of Speech Clause of the First Amendment

#### A.  Advertising space on a WMATA Metrobus is a nonpublic or limited forum.

Since the advertisement plaintiff wants to run is on a public bus, this case is governed by the case law concerning free expression on government property. It is well established that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981). When analyzing whether restrictions of speech on government property violate the First

Amendment, courts apply the public forum doctrine. *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1070 (D.C. Cir. 2012). The public forum doctrine divides government property into three separate categories: 1) traditional public forums, 2) designated public forums, and 3) nonpublic forums. *Id.* The categorical designation of the forum will determine the level of scrutiny courts apply to any restrictions on private speech. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).

"Traditional public forums" are "[p]laces which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Streets and parks are "quintessential public forums" that "have immemorially been held in trust for the use of the public, and . . . have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.,* quoting *Hague v. CIO,* 310 U.S. 496, 515 (1939). "Designated public forums" come into being when, "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose," *Pleasant Grove City v. Summum,* 555 U.S. 460, 469 (2009), in other words, for the purpose of "expressive activity." *Perry Educ. Ass'n*, 460 U.S. at 45.

Courts apply a strict scrutiny standard when evaluating speech restrictions imposed on the use of a traditional or designated public forum. *See Pleasant Grove City,* 555 U.S. at 469–70. Under this standard, restrictions "must be content-neutral, narrowly tailored to serve a significant governmental interest, and allow for sufficient alternative channels of communication." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1390 (D.C. Cir. 1990), citing *Ward v. Rock Against Racism*, 491 U.S. 781, 789 (1989). When that standard is applied, the Supreme Court "has generally struck down governmental discrimination among the 'proper' subjects for expressive

activity." *U.S. Sw. Africa/Namibia Trade & Cultural Council v. United States*, 708 F.2d 760, 763 (D.C. Cir. 1983).

A different standard governs "nonpublic forums" which are "not by tradition or designation a forum for public communication." *Perry Educ. Ass'n,* 460 U.S. at 46. As the D.C. Circuit has observed, the Supreme Court has characterized "prisons, military bases, and buses" as nonpublic forums. *U.S. Sw. Africa/Namibia Trade & Cultural Council*, 708 F.2d at 763. "In these places the government may 'reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Initiative & Referendum Inst.*, 685 F.3d at 1070, quoting *Perry Educ. Ass'n*, 460 U.S. at 46; *see also U.S. Sw. Africa/Namibia Trade & Cultural Council*, 708 F.2d at 763 (courts have "sustained the use of subject matter restrictions provided that they are reasonably designed to limit expressive activities to uses compatible with the public facilities' intended purposes and not imposed to suppress expression simply because public officials oppose the speaker's particular point of view").

 In other words, if the forum "is not a public forum, the regulation will be upheld as long as the restrictions are reasonable and are not directed at opposing the views of particular individuals." *Cmty. for Creative Non-Violence*, 893 F.2d at 1390.

As the Archdiocese acknowledged at the hearing on this motion, at the time it proposed to purchase advertising space, the exterior of a Metrobus was not a public forum or a designated public forum. In determining the forum designation of a particular government resource, a court must evaluate the government's intent for the forum as evidenced by its "policy and practice" and "the nature of the [government] property and its compatibility with expressive activity." *Cornelius*,

473 U.S. at 802. Thus, the history of WMATA's approach to advertising space on its buses and trains is relevant to this conclusion.

Prior to 2015, WMATA accepted a wide array of political, issue-oriented and religious ads. In light of this practice and policy, the Court of Appeals ruled in 1984 that WMATA's advertising space was a public forum. *Lebron v. Wash. Metro. Area Transit Auth.*, 749 F.2d 893, 896 (D.C. Cir. 1984) ("There is no . . . question that WMATA has converted its subway stations into public fora by accepting . . . political advertising.").

In 2015, however, WMATA changed its policy. As the declarations and exhibits supplied in opposition to the motion for injunctive relief explain, WMATA became increasingly concerned that issue-oriented ads were disrupting its operations and undermining its core mission of providing safe and reliable public transportation. In May 2015, its Board of Directors adopted a motion by its Chair to temporarily suspend all issue-oriented advertising, including political and religious ads, pending review and public comment. *See* Resolution. After completing its review, the Board approved a new set of guidelines on November 19, 2015. *See* Guidelines. In addition to providing guidance concerning commercial advertisements, the Guidelines impose a permanent bar on all political, religious, and issue-oriented ads. *See* Guidelines 9, 11, 12, 14. With respect to religion in particular, Guideline 12 provides: "Advertisements that promote or oppose any religion, religious practice or belief are prohibited." *Id*. The adoption of this Guideline had the effect of transforming what was once a designated public forum into a nonpublic forum. *See Cornelius,* 473 U.S. at 805 (the "historical background indicates" that WMATA's Guidelines were "designed to minimize the disruption" caused by the prior ad policy and to "lessen[ ] the amount of expressive activity occurring on federal property").

This conclusion is consistent with the Supreme Court's ruling in *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974). In *Lehman*, petitioner challenged a policy that prohibited political advertising on city buses on First Amendment grounds. The Court ruled that advertising space on a public bus was not a public forum because the city had "consciously . . . limited access to its transit system advertising space in order to minimize chances of abuse, [and] the appearance of favoritism." 418 U.S. at 304.

> Here, were have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce. It must provide rapid, convenient, pleasant, and inexpensive service to the commuters . . . . The [advertising] space, although incidental to the provision of public transportation, is a part of the commercial venture. . . . [A] city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles.

*Id.* at 303.

This ruling is also consistent with a recent ruling of another court in this district and one in the Southern District of New York. *See Am. Freedom Def. Initiative v. WMATA*, 245 F. Supp. 3d 205, 209–211 (D.D.C. 2017) (holding that WMATA became a nonpublic forum once it amended its Guidelines in 2015); *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 109 F. Supp. 3d 626, 628 (S.D.N.Y. 2015), *aff'd*, 815 F.3d 105 (2d Cir. 2016) (noting that, while the case before it was moot, since the New York Metropolitan Transportation Authority "no longer accepts any political

advertisements," it was "likely" no longer a "designated public forum," but rather, a nonpublic or limited public forum).[9]

Plaintiff maintains in its motion that at an "absolute minimum, WMATA's exterior bus displays constitute a limited public forum[.]" Pl.'s Mot. at 13. But both parties agree that the same test would apply to a "limited public forum" and to a "nonpublic forum." *Pleasant Grove City*, 555 U.S. at 470 (if "a forum . . . is limited to use by certain groups or dedicated solely to the discussion of certain subjects," then speech restrictions need only be "reasonable and viewpoint neutral").

Because the Court finds that WMATA's advertising space is a nonpublic or limited forum, it must go on to evaluate whether Guideline 12 is viewpoint neutral and reasonable. *Cornelius*, 473 U.S. at 800.

### B. Guideline 12 is viewpoint neutral.

"[C]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 392–3 (1993), quoting *Cornelius*, 473 U.S. at 806. ("Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum or if he is not a member of the class of speakers for whose especial benefit the forum was

_____

9        Plaintiff noted in its motion that the D.C. Circuit ruled in *Community for Creative Non-Violence* that subway stations are "public fora, either in traditional terms or by designation." Pl.'s Mot. at 13. It also argued, without citation, that because buses travel on public streets, and can be seen from the streets and the sidewalks, they qualify as traditional public fora. *Id.*; Pl.'s Reply at 2. By plaintiff's logic, all government property that can be seen from the street would become a public forum. But during the preliminary injunction hearing, plaintiff walked away from its position that the bus could be a public forum and agreed that the exterior of the public bus was a "limited public forum."

created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.") (internal citations omitted).

As the Supreme Court has explained:

> [I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995).

Plaintiff appears to recognize that the law governing anything other than a viewpoint restriction is unfavorable to its case – indeed, its memorandum does not even set out the low threshold that would apply in the case of a content-based restriction in a limited public forum. It seeks to avoid the application of these principles by characterizing WMATA's action as a viewpoint based decision, but the viewpoint cases are not analogous.

Plaintiff relies heavily on *Rosenberger*. In that case, a university maintained a fund which could be used to defray the costs of printing student publications, but it denied a student organization publishing a newspaper with a Christian editorial viewpoint access to the fund. The Supreme Court condemned the action as an unconstitutional violation of the First Amendment, stating:

> [T]he University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints. . . . The prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments, for the subjects discussed were otherwise within the approved category of publications.

515 U.S. at 831.

But in this case, religion *is* excluded as a subject matter, and it was that general subject matter that led to the prohibition.

In *Lamb's Chapel*, the school district involved refused to permit a church to show a film on school property concerning child rearing and family values – an otherwise permitted topic – for the sole reason that the topic would be addressed from a religious perspective, and the Supreme Court found that to be unconstitutional. 508 U.S. at 394. Similarly, in *Good News Club v. Milford Central School District,* 533 U.S. 98 (2001), the school district had adopted a community-use policy. The Court found that since the policy opened school property to events "pertaining to the welfare of the community," and thereby made any group that "promote[s] the moral and character development of children" eligible to use the building, it could not deny meeting space for a club promoting moral character for children sponsored by a private Christian organization. *Id.* at 108–09. The Court observed that the organization intended to address permissible subject matter – moral character – from a religious perspective, and it found the school district's action to be impermissible viewpoint-based discrimination. *Id.* at 111–12.

But here, the boundaries of the forum are much more limited. The advertisement does not seek to address a general, otherwise permissible topic from a religious perspective – the sole purpose of directing the public to www.findtheperfectgift.org is to promote religion. The website declares: "JESUS is the perfect gift. [F]ind the perfect gift of God's love this Christmas" and "[T]ake time to receive God's love for you at Christmas Mass."[10] Indeed, plaintiff insists on this

---

10    The Archdiocese agreed at oral argument that the complaint specifically incorporates the religious content of the website in its allegations concerning the content of the ad. *See* Compl. ¶¶ 11, 19. But plaintiff also acknowledged that the images of the shepherds and the star of Bethlehem are part of the iconography traditionally used to depict the night that Christ was born, and that the ad, notwithstanding its simplicity, telegraphs a religious message even before one takes the website into consideration.

characterization in its own memorandum. *See* Pl.'s Mot. at 6 ("The advertisements are part of a larger campaign to encourage individuals to return to church during Advent and to give charitably in their communities."); *id.* at 15 ("[T]he Archdiocese's campaign expresses the view that the 'perfect gift' during the Christmas season is devotion to God and service to others."); and *id.* at 23 (the campaign is a "uniquely effective means of transmitting [the Archdiocese's] message").

The Archdiocese argues nonetheless that WMATA has engaged in viewpoint-based discrimination when renting out advertising space. It maintains that since WMATA is willing to accept ordinary commercial advertisements during the holiday season, it publishes messages that express a viewpoint promoting the commercialization of Christmas. So, the rejection of the Archdiocese's spiritual message concerning Christmas is the suppression of a religious viewpoint on the same subject matter. But this is a strained analogy.

Plaintiff's argument is founded on a mischaracterization of what is happening on the side of the bus. Advertisements that meet the Guidelines' requirements for commercial advertisement are just that: commercial advertisements. They proclaim:

Shop here!

Buy this!

There is nothing in the complaint beyond plaintiff's conclusory allegation that WMATA accepts ads that "promote" commercialism that suggests that these ads convey a *viewpoint* on the question of how Christmas should be observed – whether it should be more commercial, or more true to its spiritual origins instead. An ad for Macy's does not communicate the Macy's perspective on the matter; while messages from retail establishments may be a manifestation of the commercialization and consumerism that characterize our society in general, and they may reflect the merchants' aim to profit from the gift-giving activity, all that they convey is: if you are

buying a gift for any reason during the current season, bring your business to us. Plaintiff cannot dispute that similar advertisements "encouraging consumers to buy more goods and services," Compl. ¶ 24, appear all year round, and they are not inherently inconsistent with a religious perspective or with faith-based observance.[11]

And on the other side of the supposed conversation, the Find the Perfect Gift campaign does not offer the Archdiocese's perspective on a subject that is addressed in commercial messages. As the representatives of the Archdiocese make abundantly clear in their declarations, what their ads were designed to do was to promote the Roman Catholic religion:

> The Find the Perfect Gift campaign is an important part of the Archdiocese's evangelization efforts. Advent and Christmas are some of the biggest evangelizing moments we have all year, as people are more open to questions of faith and spiritual experiences during these seasons . . .

> The Roman Catholic Church teaches that when we celebrate the liturgy of Advent each year, we recall the centuries and millennia when the world

---

11      Another problem with plaintiff's argument is that the complaint does not allege, nor do the exhibits to the motion for injunctive relief reveal, that any ads related to shopping are actually being displayed on the exterior of a Metro bus, or if they are, what they say or convey. So it is not clear whether the purported viewpoint ads mention Christmas at all, whether they are cast in terms of the broader holiday season, or whether they concern a different subject matter altogether. The problem created by the absence of such information in the record became quite clear at oral argument, when counsel's ability to articulate what the viewpoint of any ad might be depended in large part on how it was hypothetically worded or what it hypothetically depicted. Thus, the record does not support the Archdiocese's allegation that every commercial advertisement published in December can be presumed to communicate a viewpoint about Christmas, much less that it necessarily communicates one that is inimical to spirituality.

Counsel concluded his argument at the hearing by making the point that if WMATA accepts an advertisement seeking charitable donations – either "because" such donations are beneficial to the recipient, or without any stated reason – the Archdiocese must be able to publish an ad that expressly calls for contributions "because" the Church teaches that they are an expression of faith. This argument left the strong impression that the Archdiocese would argue that every commercial advertisement conveys a message about *some* secular topic, and therefore, WMATA's acceptance of any commercial advertisement would require it to broadcast a religious reply that could be said to bear on that topic. This approach obliterates the distinction between viewpoint-based and content-based restrictions, and it is not consistent with Supreme Court First Amendment case law.

awaited the arrival of the Messiah. By sharing in the long preparation for the Savior's arrival with the first Christmas, we renew our ardent desire for Christ's second coming . . .

It is also critically import for the goals of the Find the Perfect Gift campaign that the Archdiocese spread its message as broadly as possible within the metropolitan area. The campaign seeks to invite the public to consider the spiritual meaning of Christmas, to consider celebrating Advent/Christmas by going to Mass at one of our parishes and/or joining in one of our many programs that care for the most vulnerable and poor during Advent and beyond.

Timoney Decl. ¶¶ 4–6.

Since plaintiff has failed to allege facts that would show that WMATA rejected its proposed advertisement solely to suppress a point of view that plaintiff sought to espouse on an otherwise includible subject, *see Cornelius*, 473 U.S. at 806, the complaint does not allege the existence of a viewpoint based restriction, and Count I rests on the validity of the broad prohibition against any religious advertising. Since the content-based restriction on promoting or opposing religion is neutral and reasonable, the Archdiocese is not likely to succeed on the merits of its Free Speech claim.[12]

---

[12] The Archdiocese argued on page 15 of its memorandum that even if the policy could be construed as content-based discrimination and not viewpoint based, "it would still fail to satisfy the First Amendment's demands because such a wholesale banishment of religious content is contrary to our constitutional tradition." Pl.'s Mot. at 15. At the hearing, counsel argued that the *Good News Club* decision stands for this proposition.

While it is true that the Court announced at the start of the *Good News Club* opinion that it granted certiorari to resolve a conflict in the Circuits as to whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech, 533 U.S. at 105, it did not reach the question of whether such a blanket content-based prohibition would be unlawful. Instead, it applied the principles set out in *Lamb's Chapel* and *Rosenberger* to strike down the school district's action as impermissible viewpoint discrimination. *Id.* at 106. In *Lamb's Chapel*, the Court was presented with a school district rule that excluded religious use of the property altogether, but it did not strike it down on the basis that the prohibition of religious content was unconstitutional; it held that the rule was impermissibly applied to block the petitioner from expressing its view on a subject that was otherwise permissible. 508 U.S. at 392-4.

**C. Guideline 12 is reasonable.**

A restriction on private speech in a nonpublic forum is "reasonable if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use." *Initiative & Referendum Inst.*, 685 F.3d at 1073. The Supreme Court has emphasized that "[t]he Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808 (emphasis in original).

After undertaking a review process and accepting public comment, WMATA concluded that maintaining its advertising space as an open public forum was disruptive to WMATA's core mission of providing safe, reliable public transportation. In its opposition to plaintiff's motion, WMATA identifies the four reasons that motivated its decision: 1) community and employee opposition, 2) security risks, 3) vandalism, and the 4) administrative burdens tied to spending "substantial time" reviewing proposed ads. Bowersox Decl. ¶¶ 9–13. WMATA's survey of the public's view on issue-oriented ads found that: 1) 98% of the public was familiar with the types of ads featured on WMATA buses, trains, and stations; 2) 58% opposed issue-oriented ads, while 41% supported such ads; and 3) 46% were extremely opposed to issue-oriented ads, compared to 20% that were extremely supportive of issue-oriented ads. *Id.* ¶ 14. Ultimately, WMATA concluded that these factors outweighed the "the economic benefits of [ ] issue-oriented ads." *Id.* ¶ 9.

Plaintiff supplied the Court with an alternative regulation from another jurisdiction as an example of a policy that did not exclude religion entirely and would therefore be more reasonable. Ex. A to Pl.'s Reply. But the Court is not being asked, nor is it authorized, to make its own judgment about what would be the most effective or the most appropriate approach to balancing all of the competing concerns. The Supreme Court has made it clear that the inquiry is not whether

there might be another equally reasonable or even a more reasonable step to take, *Cornelius*, 473 U.S. at 808, and the fact that one county enacted a different policy that does not expressly mention religion does not make WMATA's decision unreasonable. WMATA had to take the area's diverse population and the many visitors who flock to the Nation's capital – often to express their strong political and religious views – into account. Moreover, the level of divisiveness and antagonism in our social discourse, and the potential for violence, has likely increased since 2012 when King County passed its policy.

Plaintiff contends that WMATA's reasons do not support the prohibition of religious ads because "[r]eligious viewpoints do not carry an inherently greater risk of provoking community discord, creating discriminatory statements, and generating safety threats." Pl.'s Mot. at 16. It also asserts, "[m]essages encouraging individuals to attend mass or confession are not inherently more divisive than messages encouraging individuals to attend concerts or to shop." *Id.* That may well be the Archdiocese's position. But even if one puts aside the role that religious differences have played and continue to play in conflicts throughout history and across the globe, WMATA's experience with religious references on public transit gave it a reasonable basis to come to the opposite conclusion. For example, WMATA proffered evidence that in 2001, when a group of Catholics purchased an ad that was critical of the Church's position on the use of condoms, it received hundreds of complaints, including one from the plaintiff. Bowersox Decl. ¶ 25. WMATA also points to controversy generated by advertisements promoting Islam in subway stations in New York. Weisel Decl., Exh. L. to Def.'s Opp. By adopting Guideline 12, WMATA reasonably

sought to reduce the number of complaints it received from employees and customers and to also reduce the vandalism that strong reactions could provoke.[13]

The WMATA Assistant General Manager for Customer Service, Communications, and Marketing also averred that she heard from the Metro Transit Police Department and the U.S. Department of Homeland Security that running certain issue-oriented ads could pose security risks on trains and buses. Bowersox Decl. ¶ 11. One of the factors that spurred WMATA to close its advertising forum was the submission of an ad featuring a cartoon depiction of the Prophet Mohammad. Def.'s Opp. at 17. Drawing the Prophet Mohammed is highly offensive to Muslims, and WMATA was aware that the ad was drawn at a contest where two gunmen were killed in an attempt to prevent the event. Bowersox Decl. ¶ 11; Weisel Decl., Exh. M to Def.'s Opp.

Given WMATA's concerns about the risks posed by issue-oriented ads, including ads promoting or opposing religion, its decision was reasonable. *See Am. Freedom Def. Initiative v. WMATA*, 245 F. Supp. 3d at 213 (holding that WMATA's prohibition on issue-oriented ads was reasonable). The regulation is reasonably aligned with WMATA's duty to provide safe, reliable transportation in the Nation's capital and surrounding areas, and it does not violate the First Amendment. *See, e.g., Lehman*, 418 U.S. at 304 ("[T]he managerial decision to limit [bus advertising] space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation.").

---

13    This conclusion is reinforced by the fact that, as plaintiff emphasized, bus advertising is "big, bold, [and] in your face every day." McFadden Decl. ¶ 10.

**D. Guideline 12 does not invite discriminatory enforcement on its face and it is not being discriminatorily applied here.**

The Archdiocese did not dispute at oral argument that its advertisement promotes religion and is therefore covered by Guideline 12. However, it claims that WMATA's use of its Guideline violates the First Amendment on its face and as applied because it is not consistently enforced.

The Guideline itself is short and clear and does not include the sort of subjective terminology that could invite arbitrary or discriminatory enforcement.[14]

The basis for plaintiff's claim that the Guideline is flawed on its face is the same as its argument that it is discriminatory as applied: other ads that allegedly promote or oppose religion have been accepted. Plaintiff argues that the Guideline must be facially invalid if the word "religion" has given rise to varying interpretations, and it complains that this discriminatory enforcement violates the Free Speech Clause, the Establishment Clause and the Equal Protection Clause. The problem with this argument is that while plaintiff's proposed advertisement, as plaintiff candidly acknowledges, promotes religion, the other ads do not.

---

14    The Court observes that this certainly cannot be said of the King County Department of Transportation Transit Advertising Policy, Ex. A to Pl.'s Reply, which plaintiff touted as an example of a reasonable policy. While the policy supplies, in excruciating detail, the specifics of what might contravene the ban on "Sexual and/or Excretory Subject Matter," *id.* § 6.2.3, it leaves a great deal of what might qualify as "Demeaning or Disparaging," *id.* § 6.2.8, or "Harmful or Disruptive to Transit System," *id.* § 6.2.9 up to the reviewer. *See id.* § 6.2.8 ("[F]or purposes of determining whether an advertisement contains such material, the County will determine whether a reasonably prudent person, knowledgeable of the County's ridership and using prevailing community standards, would believe that the advertisement contains material that ridicules or mocks, is abusive or hostile to, or debases the dignity or stature of any individual, group of individuals or entity.") and *id.* § 6.2.9 ("[T]he County will determine whether a reasonably prudent person, knowledgeable of the County's ridership and using prevailing community standards, would believe that the material is so objectionable that it is reasonably foreseeable that it will result in harm to, disruption of or interference with the transportation system."). While this purports to be an objective, reasonable man standard, the invocation of the county ridership's point of view and community standards leaves considerably more room for arbitrary application than the word "religion."

Plaintiff directs the Court to two advertisements that were accepted for the exterior of Metro buses: one for the Salvation Army Red Kettle campaign and one for CorePower Yoga. Plaintiff argues that the Salvation Army is a religious organization, and that yoga is a religious practice or has religious origins, Pl.'s Mot. at 17–18, so WMATA was bound to accept the Archdiocese's ad as well.[15]

But the inquiry is whether the *advertisements* promote religion. The Salvation Army advertisement seeks charitable contributions and nothing more. Ex. E to Bowersox Decl.



The Red Kettle may be a well-known symbol of the season, but there is nothing religious about it. The ad does not promote or oppose any religion or religious practice; while the Salvation Army has a religious origin and affiliation, what the ad is promoting is the act of giving and the practical effect on the recipient. While charitable giving is a fundamental tenet of many faiths, the advertisement does not advance or reject any religious imperative or spiritual inspiration for the activity it is seeking to encourage.

---

15    Plaintiff and the amici also argued that advertisements for performances of "The Book of Mormon" fell within the prohibition since the musical disparages, or at least, pokes fun at, a religion. Amicus Brief, Ethics and Pub. Policy Ctr. and First Liberty Inst. in Supp. of Pl. [Dkt. # 11] at 6. Putting aside the fact that this is a somewhat cursory summary of the show, the fact that there will be satire presented onstage does not transform a poster publicizing the existence of the performance or the availability of tickets into a communication that *itself* promotes or opposes a religion.

CorePower Yoga is a chain selling memberships to "yoga fitness studios" that offer "unique" hybrid workouts called "yoga-based fitness classes." *See* https://www.corepoweryoga. com/.  The ad announcing the opening of a new location does not promote any religion or religious practice or belief.[16]



Exhibit F to Bowersox Decl.

---

16    The choice of the slogan "Mantra + Muscle" does not change that assessment just because the word mantra can mean a religious incantation.

Plaintiff urged the Court to look beyond the surface of the buses and to review the websites of each organization because the links appear in the ads, and because the content of the Archdiocese's Find the Perfect Gift website has come into play in considering this motion.[17] But neither link is as intrinsic to the message of the ad as it is in plaintiff's proposed ad, where the link *is* the message. And, in any event, the website for the National Capital Area Command identified on the Salvation Army's signs, http://salvationarmynca.org/, is focused on fundraising and service. Beyond the mission statement that it takes several clicks to reach, there is little content that is more overtly religious than the ad, and therefore, even after accessing the website, it does not appear to the Court that the Salvation Army *ad* falls within the Guideline.[18]

Similarly, a review of the CorePower Yoga website reveals that no matter what the religious origins of yoga may have been, or to what extent Hinduism, Buddhism, or any other spiritual elements remain incorporated in yoga practice in the United States, religion is not what is being offered at CorePower Yoga. The website is filled with references to "our version of yoga"

---

[17]     It is important to note that the Find the Perfect Gift link does not connect to the general website for the Archdiocese of Washington, www.adv.org, but rather, it leads to a separate website created specifically for the Advent campaign that was to be advanced by the proposed advertisements. Thus, it is not analogous to the Salvation Army's general website, which is not what is being advertised in the Red Kettle ads.

         Moreover, plaintiff's complaint and memorandum specifically refer to and incorporate the content of the website and emphasize the message it conveys to support the argument that the rejection of the ad suppresses a religious viewpoint, and that immediate injunctive relief is warranted. *See also* Pl.'s Mot. at 6 ("The advertisements are part of a larger campaign to encourage individuals to return to church during Advent and to give charitably in their communities."); *see also* Compl. ¶ 10 ("The goal of the campaign is to encourage individuals to seek spiritual gifts during this Christmas season."); *id.* ¶ 11 ("All of the advertisements refer to an Internet site, FindThePerfectGift.org, which contains links to Mass schedules, opportunities for charitable service, information about religious holiday traditions, and reflections on the meaning of the Advent and Christmas seasons."); and *id.* ¶ 26 ("The Find the Perfect Gift campaign has a purpose and meaning that is tied intrinsically to the liturgical season of Advent."). So it is hardly unfair to take the content of the plaintiff's website into consideration since that is the very content plaintiff seeks to disseminate.

and "our unique style of yoga," and it touts the potential physical benefits of its intensive cardiovascular workout "based on" yoga and set to energizing music. *See*

---

18    The homepage has a banner displaying various donation and service opportunities, and it presents large links for "Volunteer," "Get Help," and "Events," as well as smaller links to "About," "Ways to Give," "Ways We Help," "Volunteer," etc.   The Salvation Army, http://www.salvationarmynca.org (last visited Dec. 8, 2017).  The "About" page emphasizes service:  "The Salvation Army National Capital Area Command serves anyone in crisis in the District, Suburban Maryland, and Northern Virginia.  Whether it's a hot meal, help paying a bill or a more long-term solution, every county in the region includes either a Salvation Army Corps or field office ready to help." *Id.*  From the "About" page, there are several links to "Learn More," including one to "Our Mission and Vision." *Id.*  The mission is plainly religious, while the vision is more ecumenical:

> Our Mission
> The Salvation Army, an international movement, is an evangelical part of the Universal Christian Church.  Its message is based on the Bible.  Its ministry is motivated by the love of God.  Its mission is to preach the gospel of Jesus Christ and to meet human needs in His name without discrimination.
>
> Our Vision
> To have a Greater Washington, DC area be a place where people of all ages live in safe and sustainable communities in which differences are respected, and people are empowered to learn, work, and worship in freedom.

*Id.*  Plaintiff's reply points out that counsel for the Archdiocese was able, after clicking from the home page to the "Find Us" page and then to the "Alexandria Corps" page, *see*  Williams Decl. in Support of Pl.'s Mot. [Dkt. 12-1] ¶ 6, to land upon a page on the Salvation Army site that sets out the dates and locations for Spiritual Care and Worship in addition to describing the local corps's work in the community with homeless women. *See* http://salvationarmynca.org/alexandria-va/. But that does not make the ad on the bus – which is a call for donations and not an exhortation to visit the website or to join the Salvation Army – an ad promoting religion.

https://www.corepoweryoga.com.[19]   It is about as distant from the ancient Indian religious traditions that gave rise to yoga as Black Friday at Best Buy is from Bethlehem.

---

[19]     The CorePower homepage superimposes the words "CorePower Yoga – Live Your Power" over a video of a studio full of well-chiseled men and women pumping hand-held weights while assuming traditional yoga positions and stances.  Choosing "The Experience" from the menu of choices available on the homepage brings up a page that announces, "Discover Your Most Powerful Inner Self: Inside our yoga fitness studios, something amazing is happening. With this high intensity workout, you'll push past physical boundaries with an open mind and a beating heart, turning doubt into security, strangers into friends, and stress into sweat." In addition to incorporating weights, the classes at CorePower's "yoga fitness studio" can further diverge from traditional yoga practice when they are "set to an energizing playlist" or "incredible music."  As the website informs those who "already love yoga," "[w]e've held onto the magic of yoga, while upping the intensity factor for a more powerful, purposeful workout. Take your yoga practice up a notch with a renewed sense of focus and strength." To those who are new to yoga, CorePower explains that "[w]e believe in working every muscle and every emotion." In the Frequently Asked Question section, CorePower asks, "what are some of the benefits of yoga?" Answer: "There are countless benefits to our style of yoga. You'll turn stress into sweat, rigid into fluid, and our community can turn strangers into friends. Plus, you'll increase circulation, flexibility and strength, while enhancing sleep quality. A regular yoga practice . . . has been shown to improve the symptoms of many chronic diseases . . ."
         You have to look quite hard to find any reference on the website to anything even arguably spiritual – CorePower's answer to "What does 'Yoga' mean?" is: "Yoga can be traced back to ancient India more than 5,000 years ago. Yoga is a Sanskrit word meaning to join, or yoke; a union. Conceptually, yoga is the practice of fully uniting the body, mind and spirit." The fact that plaintiff was able to put its finger on one of these lonely references to one's spirit or soul is not enough to make an ad announcing the opening of a new studio an ad that promotes religion.

Based on the record before it, then, the Court finds that plaintiff is not likely to succeed on its claim that its constitutional rights were violated by the inconsistent application of Guideline 12.[20]

[20]     In its reply brief, plaintiff pointed to a third ad, supposedly purchased from WMATA by a Christian radio station, WGTS 91.9. *See* Declaration of Michael F. Williams, Dkt. # 12–1 ¶ 3 ("Attached as Exhibit B is a true and correct copy of a photograph of a WMATA public bus on a public thoroughfare displaying advertising for WGTS 91.1, a Christ-centered, nonprofit, listener-supported media ministry serving the Washington, DC region, accessed over the Internet on December 4, 2017 at http://columbiaunion.org/content/wgts-919s-history-timeline.")



Ex. B to Pl.'s Reply [Dkt. # 12–3]. But while the Declaration states the date that counsel discovered the photograph on the internet, neither the Declaration nor the link provides any information about where or when the picture was taken. And the bus did not appear to be a red and grey Metrobus. Defendant subsequently submitted a declaration from WMATA's Assistant General Manager of Bus Services stating that, "The bus in the picture [provided by plaintiff] is not a [WMATA] Metrobus. The number on the bus, "5359," is not a Metrobus number. The color scheme is not a Metrobus color scheme.") Decl. of Robert O. Potts, in Support of Def.'s Opp. [Dkt. # 13] ¶ 2.



*See id.*

Thereafter, the Court received another Declaration from Michael Williams, revealing that he had transmitted to counsel for WMATA a link to a different website from May of 2016 in which the writer congratulated WGTS for its "successful ad campaign in Washington, D.C." Decl. of Michael F. Williams [Dkt. # 14]. But the bus depicted on that webpage is also blue. http://www.billscottgroup.com/2016/05/17/radio-station-bus-campagins/.

Counsel for WMATA, to his credit, endeavored to research whether WMATA had ever run the ad and informed the court in a declaration that "as best as WMATA has been able to determine given the tight time frame, the WGTS ad was carried on WMATA's buses in April 2017." Decl. of Rex Heinke [Dkt. # 15] ¶ 8. (The webpage is from a year earlier.) While this constitutes some evidence that WMATA may have accepted an advertisement from a religious oriented radio station after the policy was in place, the evidence is quite thin and somewhat contradictory, and since the advertisement itself provides no hint that it is coming from a religious source, the Court is not persuaded that this additional potential fact tips the balance and undermines any of the rulings set forth in this opinion.

## II.     Count Two:  First Amendment Free Exercise of Religion

The First Amendment to the Constitution includes the prohibition that, "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I.  The Supreme Court has made clear that this constitutional right "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990), quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring).  So according to the principles set out in *Smith,* a neutral and generally applicable law will survive a challenge under the Free Exercise clause.  When assessing whether a law is neutral and generally applicable, the two inquiries tend to overlap and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32, 546 (1993).  A court is required to apply the strict scrutiny test only when a law is either not neutral or not generally applicable. *Id.* at 531–32, 546.

### A.  Guideline 12 is neutral.

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi Babalu*, 508 U.S. at 533.  Here the Guideline is not directed at any religious practice; it prohibits WMATA from publishing advertisements that promote or oppose religion.  Even if one were to characterize Guideline 12 as a policy that "restricts" the "religious practice" of evangelization, because it makes buses unavailable for that purpose, there is no showing that WMATA closed off an avenue for that practice "because of" any religious motivation animating the ads.  The policy relates to the ads' content, and it imposed an identical prohibition on advertisements that oppose religion, which are not likely to have a

religious aim. And the Guideline is part of a larger set of restrictions on controversial topics; it does not single out religion. *Cf. Lukumi Babalu*, 508 U.S. at 545–46 (concluding that the city ordinance prohibiting ritual animal sacrifice targeted the Santeria religion).

Plaintiff complains that WMATA's advertising space is a "unique public benefit" that is being withheld from the Archdiocese on account of its religion, Pl.'s Reply at 6, and it points to *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017), which prohibits the denial of a "generally available benefit solely on account of religio[n]." *See* Pl.'s Reply at 6. But its use of this authority is misplaced, not only because WMATA's advertising space is not a "generally available benefit," but also because there is no evidence of discriminatory intent.[21]

**B. Guideline 12 is generally applicable.**

To be generally applicable, a regulation "cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi Babalu,* 508 U.S. at 543. For the same reasons that the Court found the policy to be neutral, it finds that it is generally applicable. Guideline 12 applies across the board to advertisements that touch on the subject matter of religion from any perspective or motivation, and Guideline 12 is just one of several content-based restrictions placed on the nonpublic forum. Plaintiff's alleged examples of inconsistent and arbitrary enforcement

---

21     The Court also rejects plaintiff's contention that because the Guidelines implicate "both free speech and free exercise, it is a 'hybrid' restriction subject to heightened scrutiny" under *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. at 882. Pl.'s Mot at 20–21. For this argument to prevail, plaintiff would need viable claims on both the Free Speech and Free Exercise counts which it does not have. *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) ("[T]he combination of two untenable claims" does not add up to a tenable one because "in law as in mathematics zero plus zero equals zero."). Accordingly, heightened scrutiny is not applicable here.

are unpersuasive for the reasons discussed under Count I. And so, the Court finds that Guideline 12 is generally applicable.

### C. Guideline 12 does not burden religious practice.

There is also a lack of evidence that the Guidelines actually restrict or substantially burden a religious belief or practice. "[T]he First Amendment is implicated when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice," and accordingly, "this threshold showing must be made" to sustain a Free Exercise claim. *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002). Plaintiff has not satisfied this. The Archdiocese is free to spread its message throughout the Washington, D.C. metropolitan area, and its declaration reveals that it already utilized a number of private and public platforms, "includ[ing] advertisements and materials for distribution in parishes within the Archdiocese, advertisements for display in public places throughout the metropolitan area," including transit shelters not owned by WMATA, and an "integrated online campaign." McFadden Decl. ¶¶ 3, 6.

Because Guideline 12 is neutral and generally applicable and because plaintiff has not established that the Guidelines impose a substantial burden, the Court finds that plaintiff is unlikely to succeed on its Free Exercise count.

### III. Count Three: Religious Freedom Restoration Act

"Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014).[22] To this end, RFRA

---

22   Congress responded to the Supreme Court's ruling in *Smith* that the Free Exercise clause did not constitutionally protect religious practices against burdens from neutral, generally applicable laws, by enacting RFRA which offered broader protections. *Hobby Lobby*, 134 S. Ct. at 2761 ("'Laws that are "neutral" toward religion,' Congress found, 'may burden religious exercise as surely as laws intended to interfere with religious exercise.'"), quoting 42 U.S.C. § 2000bb(a)(2) (internal edits omitted).

provides that the government "shall not substantially burden a person's exercise of religion" unless it can demonstrate that application of the burden to the person: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). The prohibition applies even if the burden results from a rule of general applicability. *Id.* § 2000bb-1(a). "As amended by the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), RFRA covers 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Hobby Lobby*, 134 S. Ct. at 2754, quoting 42 U.S.C. § 2000cc–5(7)(A).

The federal government and the District of Columbia are bound by RFRA. *See id.* § 2000bb–2(1); *Potter v. Dist. of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009). However, because WMATA is an inter-state agency formed by the District of Columbia, Maryland, and Virginia, defendants argue that RFRA does not apply to WMATA based on the decision in *City of Boerne v. Flores*, 521 U.S. 507 (1997). Defs.' Opp. at 26–27. In that case, the Supreme Court ruled that the application of RFRA to the states exceeded Congress's enforcement power under the Fourteenth Amendment, and so RFRA could not constitutionally be applied to the states. *Flores*, 521 U.S. at 536. Therefore, defendants argue, RFRA cannot be applied to WMATA because it would "intrude upon Maryland's and Virginia's traditional state prerogatives over transportation." Defs.' Opp. at 27. In *Morris v. Wash. Metro. Area Transit Auth.*, the D.C. Circuit ruled that Maryland's and Virginia's sovereign immunity was conferred upon WMATA, but that was in the context of a suit for damages, and the Court has not yet ruled on whether the precedent would apply to a case involving injunctive relief. 781 F.2d 218, 219 (D.C. Cir. 1986). But the Court does not need to resolve this complicated issue because it finds for other reasons that the Archdiocese is not likely to succeed on its RFRA claim.

To successfully mount a RFRA challenge and subject government action to strict scrutiny, a plaintiff must meet the initial hurdle of establishing that the government has substantially burdened his religious exercise. *Henderson v. Stanton*, 76 F. Supp. 2d 10, 14 (D.D.C. 1999). Only if that predicate has been established will the onus then shift to the government to show that the law or regulation is the least restrictive means to further a compelling interest. 42 U.S.C. §§ 2000bb-1(b), 2000bb-2(3); *Hobby Lobby*, 134 S. Ct. at 2761. "A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008), quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981); *see also Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015)[23] (finding such a burden where a prisoner was forced to choose between shaving his beard and thereby engaging in conduct that seriously violated his religious beliefs or facing serious disciplinary action); *Hobby Lobby*, 134 S. Ct. at 2775 (2014) (concluding a substantial burden existed where employers were required, under threat of severe economic penalties, to provide insurance coverage for contraceptive methods that violated their religious beliefs).

Thus, RFRA decisions turn on an element of compulsion, and here plaintiff is under no pressure to do anything. The fact that plaintiff has a sincere belief in spreading the gospel is not in dispute, but the existence of that belief, and even the sincere desire to act in accordance with it, is not enough to sustain a claim. "[T]o make religious motivation the critical focus is to read out of RFRA the condition that only substantial burdens on the exercise of religion trigger the compelling interest requirement." *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011), quoting *Henderson*, 253 F.3d at 17 (internal edits omitted). Plaintiff does not cite to any binding Supreme

---

[23] *Holt* was brought under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), *see* 42 U.S.C. § 2000cc *et seq.*, but RLIUIPA is governed by the same standard set forth in RFRA, and plaintiff cites to this case in support of its RFRA claim. *See* Pl.'s Mot. at 23.

Court or Circuit precedent that would call for the invalidation of a law when plaintiffs are not compelled, under the threat of either punishment or the denial of a benefit, to act.

There is authority that points in the other direction, though. The D.C. Circuit has held that when a restriction merely prohibits one of a multitude of methods of spreading the gospel, and it does not "force[ ] [parties] to engage in conduct that their religion forbids" or prevent "them from engaging in conduct their religion requires," those parties are not "substantially burdened." *Henderson*, 253 F.3d at 16; *see also Mahoney*, 642 F.3d at 1122. In *Henderson* and *Mahoney*, the plaintiffs challenged regulations that prevented individuals from selling t-shirts on the National Mall and regulations that prohibited "chalking" the sidewalk in a particular location in front of the White House. *See Henderson*, 253 F.3d at 13–14; *Mahoney*, 642 F.3d at 1115. Both sets of plaintiffs argued that these regulations violated RFRA because they prevented plaintiffs from following the religious requirement that they spread the gospel. *See Mahoney*, 642 F.3d at 1120; *Henderson*, 253 F.3d at 15. The Court ruled that neither regulation imposed a substantial burden because the regulations were, at most, "a restriction on one of a multitude of means" by which plaintiffs could proselytize, and other alternative means were still available. *Henderson*, 253 F.3d at 17; *see also Mahoney*, 642 F.3d at 1121–22. The Court specifically noted that neither case posed a situation where "the regulation force[d the plaintiffs] to engage in conduct that their religion forbid[]" or prevented "them from engaging in conduct their religion require[d]." *Henderson*, 253 F.3d at 16; *see also Mahoney*, 642 F.3d at 1121.

As in *Henderson* and *Mahoney*, the Archdiocese is not substantially burdened by WMATA's policy because it does not compel the Archdiocese to act in a way that violates its religion, nor does it prevent it from spreading the gospel through other means. Because plaintiff

has not established that WMATA's Guidelines substantially burdened its religious exercise, the Court finds that it is unlikely to succeed on this count.

## IV. Count Four: Equal Protection

Plaintiff's Equal Protection claim is unlikely to succeed for the same reasons that its inconsistent and discriminatory enforcement claim fails under Count I. Plaintiff alleges that WMATA treated "similarly situated religious groups" differently in violation of Equal Protection principles by rejecting the Archdiocese's ad but accepting ads from the Salvation Army and CorePower Yoga. Compl. ¶ 54; Pl.'s Mot. at 12, 18, 20. As discussed in Count I of the Court's analysis, the ads by the Salvation Army and CorePower Yoga do not promote or oppose any religion, religious practice or belief. By contrast, plaintiff has made it abundantly clear in its briefs and in oral argument that its ad seeks to "bring the Catholic faith to more believers" by buying ads on government property. Pl.'s Mot. at 23. Therefore, it is not "similarly situated," and the Court concludes that plaintiff is unlikely to succeed on its Equal Protection count.

## V. Count Five: Due Process

Plaintiff's complaint alleges that WMATA's Guideline 12 "deprives the Archdiocese of liberty and property without due process." Compl. ¶ 56. Neither the complaint nor the memorandum identifies a liberty or property interest that has been compromised other than the First Amendment rights plaintiff seeks to vindicate in Count I and Count II. At the hearing, plaintiff agreed that for the purpose of the preliminary injunction motion, the due process should

be viewed as alleging just a deprivation of those rights.  Since the Court finds that the plaintiff is unlikely to prevail on Count I and II, it is also unlikely to prevail on the Due Process count.

## VI.    Irreparable Harm

Plaintiff argues in its motion that it will suffer irreparable harm if the Court does not issue the requested injunctive relief. Pl.'s Mot. at 25.  Plaintiff's showing on this point is its assertion that the loss of First Amendment freedoms constitutes irreparable injury.  *Id*.  Since plaintiff alleges no other harm that it seeks to avert, its irreparable harm argument rises and falls with its merits arguments.  Since the Court has concluded that plaintiff's constitutional and statutory rights have not been violated, plaintiff has failed to demonstrate that it would suffer irreparable harm in the absence of relief.  Under those circumstances, it is not necessary for the Court to go on to the question of whether WMATA would be harmed by the proposed injunction or where the public interest lies.

### CONCLUSION

Based on the information submitted by the parties, their representations made at the hearing on December 5, 2017, and for the reasons set forth above, an order will issue denying the motion for preliminary injunction.


AMY BERMAN JACKSON
United States District Judge

DATE:  December 8, 2017